HAGE *v.* E. L. WELLMAN CO.

1. EVIDENCE—TELEPHONE CONVERSATION—ADMISSIBILITY—WRITTEN CONTRACTS—BREACH OF CONTRACT.

In an action for damages for the breach of a contract for the sale of two car loads of corn, testimony by plaintiff as to telephone conversations with defendant's manager giving shipping instructions was properly received in evidence, not being open to the objection that it tended to vary the terms of the written contract, where it was

confirmatory of, and not contradictory to, the terms thereof.

2. SAME—QUESTION FOR JURY.

Where the question as to what was said over the telephone was in dispute it was properly left to the jury, as a question of fact.

3. PRINCIPAL AND AGENT — AGENT'S AUTHORITY — QUESTION FOR JURY.

Where defendant's business as a dealer in grain, feed, etc., was conducted by managers of different departments, and one of said managers called plaintiff on the telephone and during the conversation promised to give to the proper manager plaintiff's shipping instructions for two car loads of corn already ordered, said manager's authority to receive said communication for his principal was properly a question of fact for the jury, since it was clearly relevant to the employer's business.

4. SALES—PLACE OF DELIVERY—UNIFORM SALES ACT—QUESTION FOR JURY.

Where a contract for the sale of two car loads of corn is open to the construction that the buyer's place of business was intended by the parties to be the place of delivery, the provision of the uniform sales act (3 Comp. Laws 1915, § 11874) that "apart from any such contract, express or implied, or usage of trade to the contrary, the place of delivery is the seller's place of business," is not controlling, but the question was properly left to the jury as an issue of fact.

Error to Kent; Perkins (Willis B.), J.    Submitted October 11, 1921.    (Docket No. 89.)    Decided March 30, 1922.

Assumpsit by Peter Hage and Harry Koops, copartners as the Byron Center Grain & Fuel Company, against E. L. Wellman Company for breach of a contract for the sale of certain corn.    Judgment for plaintiffs.    Defendant brings error.    Affirmed.

*Clare J. Hall,* for appellant.

*John M. Dunham,* for appellees.

STEERE, J.   This action was brought to recover damages for failure to ship plaintiff two car loads of corn according to a claimed contract between the parties.   Plaintiff is a copartnership engaged in the retail fuel and grain business in the village of Byron Center, Kent county.   Defendant is a corporation engaged as a jobber in handling beans, grain, bags, feed and the like commodities, with its place of business and office located in the city of Grand Rapids, Kent county.   Shortly before January 2, 1920, Peter Hage, a member of plaintiff, in the presence of his partner, Koops, called up by long distance telephone the Wellman Company at Grand Rapids and ordered from it two cars of No. 3 yellow corn for March shipment, at an agreed price of $1.47 per bushel f. o. b. Byron Center.   On January 2, 1920, A. N. Sheffield, who answered the call and was then in charge of the grain desk in defendant's office, prepared and sent plaintiff a confirmation of this sale in duplicate signed by defendant.   One of these plaintiff signed "accepted" where indicated on the copy and returned it to defendant, retaining the other.   Regular printed forms kept by defendant for this purpose were used.   Defendant's confirmation with plaintiff's acceptance is as follows:

"Confirmation.

"E. L. WELLMAN

"Grain and Beans.

217 Murray Bldg.   Both 'Phones.

"Grand Rapids, Mich., Jan. 2, 1920.

"To:   Byron Center Grain & Fuel Co.,

   "Byron Center, Mich.

   *"Gentlemen:*   We have the pleasure of confirming sale of contents 2 cars No. 3 Yel. Corn at $1.47 per bu.

"Cost and Freight to Byron Center, Mich.

"F. O. B. Byron Center, Mich.

"Shippers Official Weight.

"Shippers Official Inspection.

"Shipment March.

"Same to be shipped to order of E. L. Wellman.

"Destination ...................................

"Via .........................................

"Draft with bill of lading attached. ·

"Thanking you for the same,

"Very truly yours,<br>
"E. L. WELLMAN,<br>
"Per A. N. SHEFFIELD.

"Accepted:   BYRON CENTER GRAIN & FUEL CO.

          Per P. H.

"If not strictly in accordance with your understanding, wire us immediately."

Plaintiff's evidence showed that the corn was purchased for their retail trade at Byron Center, No. 3 being the quality desired for that purpose, and in the telephone talk giving the order they so advised defendant; that directions were given to ship it to Byron Center, Michigan, to be delivered in March, the car loads to be shipped a week or two apart; that the party answering stated the price as $1.47 per bushel, delivered free on board at their station, Byron Center, Mich., and the order was so given.   Sheffield testified that the party talking to him did not tell him this order was for their retail business, and the telephone conversation closed by his saying, "You give us instructions later," which was answered "Yes," or "All right" or "something to that effect," and he made out the usual confirmation in accordance with the order received over the telephone.   On March 15th plaintiff received a call from Grand Rapids put in by Wellman Company and the party calling asked how plaintiff was fixed for feed, to which Hage who answered the telephone testified he replied that they were then well fixed, adding that they had two cars of corn coming from the Wellman Company, asked him if it had yet been shipped and said they wanted it shipped as their supply was getting low, and was answered that the party then talking would call the grainman's at-

tention to it.    The order was not filled and no corn
was ever shipped by defendant for or to plaintiff.

On April 2d defendant sent plaintiff a letter from
Grand Rapids written on its stationery notifying them
of cancellation of their account for two cars of grain,
March shipment, concluding:    "This cancellation
covers our sale to you of January 2d and same is auto-
matically cancelled."    The letter was signed:    "E. L.
Wellman Co., A. N. Sheffield."    Sheffield testified that
defendant kept its contracts for future delivery on file
and having come across this one on April 2d he can-
celed it, and sent the letter referred to, as no shipping
instructions had been given within the time specified
for shipment.    In the meantime the price of corn had
gone up from $1.47 per bushel on January 2d to $1.73
on the date of cancellation, afterwards reaching a
higher point.    Plaintiff claimed as damages the dif-
ference between those prices and was awarded a ver-
dict with judgment thereon for $565.33.

Defendant urges as reversible error that plaintiff's
testimony touching telephone instructions for delivery
was improperly received because its purport was to
change by oral evidence the terms of a written instru-
ment subsequently signed by the parties; that the tele-
phone conversation in March relative to shipping this
corn was in effect but an inquiry, was with an agent
not authorized to receive or act upon a shipping in-
struction, and the terms of the written contract be-
tween the parties made Grand Rapids the place of de-
livery when properly construed under the uniform
sales act (3 Comp. Laws 1915, § 11832 *et seq.*).

Plaintiff contends that proof of shipping instruc-
tions given at the time of ordering the corn was com-
petent, not in conflict with but confirmatory of the
written agreement designating Byron Center as the
point where delivery should be made to the consignee,
on payment of draft with bill of lading attached, and

if further shipping instructions were necessary they were given to defendant by telephone in March.

When Hage answered defendant's long distance call in March the party calling said "Wellman & Company talking. How are you fixed for feed?" followed by the conversation related. It appeared from the telephone company records that this call for plaintiff was made from defendant's office by one of its officials named Rudolph, who testified he was manager of defendant's feed department and not authorized to accept shipping instructions on grain, as Sheffield was manager of its grain department. Of this Sheffield testified that defendant's business had four departments—bean, grain, feed and bags—with a department manager in charge of each, only authorized to manage the business of his department under the general supervision of E. L. Wellman, president of the corporation. It was shown that defendant's office and place of business was on the second floor of the Murray building in Grand Rapids, where it had a private switch-board with an operator in charge and a large room with desks along its south side used by the department managers, each having a 'phone which the operator could switch to whatever connection desired. At the time this corn was bought and until the order was canceled plaintiff partners did not personally know defendant's officers or employees, or how its business was organized and managed.

At the close of proofs defendant requested a directed verdict in its favor, urging as reasons that under the contract between the parties the place of delivery was the place of defendant's business in Grand Rapids, that no demand was made for delivery, nor showing that shipping instructions were given to any agent authorized to receive them, and what was said over the telephone on that subject to any of its employees did not constitute shipping instructions. This the

court denied and submitted to the jury the question whether Rudolph was an agent of defendant with apparent authority to receive such instructions, and whether shipping instructions were in fact given by plaintiff to any authorized agent of defendant at any time within the life of the contract.

This was a long distance telephone transaction, a method of communication by which a vast volume of the world's business is now transacted. The persons speaking for the negotiating parties neither saw or knew each other. Each represented a business concern called for and answered from its office in the usual way. The contract was negotiated by a member of the partnership at one end of the line and an employee holding a responsible official position in the corporation at the other end. One of defendant's managers was at the 'phone and spoke for it, both when plaintiff called up defendant in January and when defendant called up plaintiff in March. On the first occasion, as defendant admits, and on both, as plaintiff claims, they talked about corn. When plaintiff called up defendant the talk resulted in a contract by which defendant sold plaintiff two car loads of corn for March shipment at an agreed price f. o. b. Byron Center, Mich., to be shipped to order of defendant's president—"Draft with bill of lading attached," made binding by a written confirmation mailed by defendant to plaintiff and accepted by the latter. Defendant's manager, who then talked, signed its president's name to the confirmation "per" his own name, made no suggestion as to departments in defendant's organization or limit on his authority to transact its business. Neither did the second manager who called up plaintiff after it had contracted with defendant for two cars of corn, March delivery, and asked how they were fixed for feed, which in the absence of anything to the contrary would seem to include corn. To nontechni-

cal persons of common understanding unground corn is regarded as feed for domestic animals and poultry. "Feed" is also defined by lexicographers as "Food, properly for domestic animals."

It appears that defendant, holding itself out to the public as dealing in grain, feed, etc., transacted much of its business by telephone. Manager Rudolph testified that he started the day by making tickets for the bunch of people he wanted to talk with and giving them to the switch-board operator. It is undisputed that in March he called up plaintiff, who had a contract with his company for two cars of corn to be shipped that month and asked the party answering how he was fixed for feed. He testified of this conversation that the party answering said he "was not in need of any at that time. I don't recall anything further that I said." Hage, who answered the call, confirmed that much of the conversation—that he did answer they were *then* well fixed for feed—and further told him in that connection they had two cars of corn coming from defendant which they wanted, asking if it had been, or when it would be, shipped and the party who had called replied that he would call the grain man's attention to it. Rudolph said of this that he did not refer the party to any other department, or promise to call the grain man's attention to it because "there was nothing said to me that would cause me to refer that 'phone call to Mr. Sheffield, or any other heads of departments," thus only by indirection denying Hage's testimony as to telling him about the two car loads of corn which they wanted shipped. The disputed part of that talk was left by the court to the jury as a question of fact, as well as Rudolph's apparent authority under the circumstances shown to receive for his principal plaintiff's communication relative to the two cars of corn.

This communication was clearly relevant to his em-

ployer's business, naturally suggested by the inquiry as to feed in a telephone call from defendant of whom plaintiff had bought corn for delivery that month. If defendant had in its organization privately so restricted the authority of its managers in doing business with the public that none of them could accept or recognize for it a telephone communication touching defendant's business from a customer he called up from its office during business hours for business purposes, unless the communication related to his exclusive department, it can well be urged that defendant must at its peril so advise the mistaken or inquiring customer through its answering manager or otherwise. Rudolph not only failed to undeceive the uninformed customer in that particular as he admits but, as Hage testified, apparently accepted the message for defendant and said he would call the attention of the grain man to it. The manner in which this telephone conversation arose and was conducted fairly gave color to his apparent authority in that particular. Private instructions or limitations on his apparent authority not known to plaintiff were not binding upon it. Agency and authority are questions for the jury when material facts are in dispute.

"The apparent authority of an agent to act as the representative of his principal is to be gathered from all the facts and circumstances in evidence, and ordinarily this is a question of fact for the jury's determination." 21 R. C. L. p. 856.

The question of Rudolph's apparent authority to receive plaintiff's message as agent of defendant was properly left to the jury. With it was also before the jury Hage's testimony, and Sheffield's denial, that Byron Center was given as the place of delivery, or destination, when the corn was ordered in January, for March shipment, preceding the written confirma-

tion and acceptance which followed, mailed from defendant's office to plaintiff's at the near-by village of Byron Center.

It is urged for the defense that admission of this issue based on the January telephone talk was prejudicial error calling for reversal in any event, as it plainly permitted the jury to "base their verdict upon the oral conversation which took place prior to the signing of the confirmation."

This view is necessarily founded on the assumption that the conversation contradicted or varied the terms of the confirmation.   To that point counsel contends, as applied to the written contract between the parties, that the uniform sales act fixes the place of delivery at Grand Rapids, quoting a part of subdivision 1 of section 43 of part 3 of the act (3 Comp. Laws 1915, § 11874) as follows:

"Apart from any such contract, express or implied, or usage of trade to the contrary, the place of delivery is the seller's place of business if he have one, and if not, his residence."

That section, dealing with "Place, time and manner of delivery," provides:

"Whether it is for the buyer to take possession of the goods or for the seller to send them to the buyer is a question depending in each case on the contract, express or implied, between the parties."

The portion quoted in defendant's brief continues:

—"But in case of a contract to sell or a sale of specific goods, which to the knowledge of the parties when the contract or sale was made were in some other place, then that place is the place of delivery."

Section 18, part 2, of the act provides:

"Where there is a contract to sell specific or ascertained goods, the property in them is transferred to the buyer at such time as the parties to the contract intend it to be transferred.

"For the purpose of ascertaining the intention of the parties, regard shall be had to the terms of the contract, the conduct of the parties, usages of trade and the circumstances of the case."

Section 20 of part 2 deals with "Reservation of right of possession or property when goods are shipped,"—covering various contingencies including where the seller of the goods draws on the buyer for the price and transmits the draft or bill of exchange with the bill of lading together to secure payment, etc. In defendant's confirmation appears "Draft with bill of lading attached," which would seem to negative the inference arising "apart from any such contract" that the seller's place of business in Grand Rapids was the place where the seller would deliver the goods to the buyer.

Defendant showed without dispute that the freight rates on grain from Chicago to Grand Rapids and to Byron Center were the same, that f. o. b. to Byron Center meant cost of the grain with freight to Byron Center added and that plaintiff would not be required under its contract to pay more than $1.47 per bushel for corn delivered to any other point with the same freight rate, which counsel contended is a "restatement of what this court held as a matter of law to be the meaning of such words" in the analogous case of *Dow Chemical Co.* v. *Chemical Works*, 208 Mich. 157 (14 A. L. R. 1200).

In that case the Detroit Chemical Works, located in Detroit, Michigan, made a detailed contract extending over a period of one year to furnish the Dow Chemical Company of Midland, Michigan, 900 net tons of sulphuric acid in approximately equal quantities throughout the months of that year, at a price of "twelve dollars ($12.00) per ton f. o. b. vendor's tank cars, Detroit, Michigan, less freight to Midland. * * * Terms of payment: Net cash in 10 days." Defend-

ant sought to cancel the contract because plaintiff had defaulted in making payment of an invoice within the specified time. The two major questions for determination were: (1) When was the payment due on the invoice as to which default was claimed and, (2) If the right to cancel the contract accrued to defendant by reason o delay in payment of that invoice, did defendant wa.ve that right? In disposing of those issues the court held, as plainly expressed, that Detroit was the place of delivery, but the buyer had the right to deduct the freight to Midland, or to any other designated point having the same freight rate. There the point of delivery was definitely fixed in the contract while here the defendant contends it was not.

The written confirmation contemplates a shipment and a delivery at some point. Even accepting defendant's technical construction of the suggestive provision "f. o. b. Byron Center, Mich.," and that no point of delivery was definitely fixed, it was not contradicting or varying the terms of the written agreement to supply that omission by showing the inten-tion of the parties, by proof of their conduct, oral instructions and all other circumstances of the case tending to prove their mutual understanding upon that point. That question was properly left to the jury as an issue of fact.

The judgment is therefore affirmed.

WIEST, CLARK, BIRD, and SHARPE, JJ., concurred. FELLOWS, C. J., and MOORE, J., did not sit.

The late Justice STONE took no part in this decision.